FILED

2013 AUG 30 AM 9: 51

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
DEPUTY

STEVEN JOHN BUSTI,

            **Plaintiff,**

-vs-

**Case No. A-11-CA-1029-SS**

PLATINUM STUDIOS, INC.; SCOTT
MITCHELL ROSENBERG; UNIVERSAL
STUDIOS, INC. d/b/a Universal Pictures; and
DREAMWORKS II DISTRIBUTION CO., LLC,

            **Defendants.**

---

## O R D E R

    BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendants Platinum Studios, Inc., Scott Mitchell Rosenberg, Universal Studios, Inc., and Dreamworks II Distribution Co, LLC's Motion for Summary Judgment [#51], Plaintiff Steven John Busti's Response [#64] thereto, and Defendants' Reply [#65]. Having considered the documents, the file as a whole, and the governing law, the Court now enters the following opinion and orders, granting summary judgment for Defendants.

### Background

    "An old cowpoke went ridin' out, one dark and windy day. Upon a ridge he rested as he went along his way. When all at once a [flying saucer, zooming above] he saw, a-plowing through the ragged skies, and up a cloudy draw." JOHNNY CASH, *(Ghost) Riders in the Sky, on* SILVER (Columbia Records 1979) (aliens added).

This is a case about cowboys . . . and *aliens*.  As the above quote suggests, the parties in this case are not the only artists to combine cowboys with the un-canny, and at issue here are no less than three works combining cowboys with extraterrestrial invaders.

Busti alleges his eleven-page comic book "Cowboys and Aliens" (the Comic), published in January 1995 in Issue No. 1 of an obscure publication called "Bizarre Fantasy," has been infringed by two subsequent works owned or authored by Defendants, each of which is entitled "Cowboys & Aliens."[1]  The allegedly infringing works can be described as follows:

The first, the Graphic Novel, was originally published in 2006, with a subsequent edition released in 2011,[2] in which aliens, including some large, muscular creatures resembling a cross between a great ape and a reptile, crash-land in the Wild West, and attempt to enslave both cowboys and Apache Indians.  After a prologue which juxtaposes images of Europeans violently subjugating the New World, with scenes of the monstrous aliens conquering the peaceful inhabitants of other far-flung planets, the Graphic Novel opens with a classic setup: a circled wagon train, besieged by a horde of Indians on horseback.  The hero of the Graphic Novel, a cowboy named Zeke, attempts to escape, in hopes of summoning help from a nearby U.S. Army post.  Three Indians pursue him, and are about to bring Zeke's tale to an early close, when, with a "KRAKABOOM!," a burning flying saucer flies overhead, to crash at the base of a nearby cliff.  The three Indians go to investigate first at a distance from a small rise, before going closer.  There, they encounter the monstrous, reptile-ape

---

[1] In Busti's original Complaint, he also cited a third work as infringing.  This was a "one-sheet," published in May 1997, showing a cowboy, galloping on a horse, and brandishing a pistol, while an ominous-looking alien space craft looms directly overhead, completely filling the top half of the page.  The Court previously dismissed with prejudice any claims contingent upon the one-sheet as barred by limitations.  Order of May 22, 2012 [#31] at 5.

[2] The Court also dismissed as time-barred claims predicated on the original, 2006 publication of the Graphic Novel.  *Id.*

alien leader, "Rado Dar," as he walks down the standard flying saucer ramp, with several minions in tow. The Indians attempt to greet Rado Dar, but their overture is met with a sudden barrage of green energy blasts, leaving all three dead. Zeke observes, but is either unable or unwilling to interfere. There is no need to describe the rest of the plot in detail: suffice it to say, battles, interplanetary romance, and high-speed covered-wagon chases ensue. At one point, a cowgirl character uses a lasso on one of the aliens. The aliens are ultimately defeated when the cowboys and Indians put aside their archetypical differences, and cooperate against the common foe.

The second, and no doubt best-known of all the works involved in this case, is the movie "Cowboys & Aliens," starring Harrison Ford and Daniel Craig (the Movie). It premiered in July 2011, and was subsequently released on DVD and Blu-Ray formats. Despite the big names, the film Cowboys & Aliens is not very good. Fortunately, Busti's claims against the Movie hinge on the fact it is derivative of the Graphic Novel, and not upon any direct copying in the film. Accordingly, the Court was spared the necessity of watching Cowboys & Aliens more than once, and this opinion will not dwell on the Movie any further.

Busti's "Cowboys and Aliens" Comic opens with a cowboy riding the range, when "all at once," a flying saucer zooms overhead. The Comic features a large, muscle-bound, vaguely reptilian alien named "Morguu," who lands his flying saucer at the base of a cliff in the Wild West, with sinister plans to enslave humanity. Descending from the ramp of his flying saucer, he encounters two Apache Indians who are observing from behind some rocks. Morguu offers to spare the Indians' lives if they become his slaves, an offer they objectively reject by manifest act, namely by throwing a spear at Morguu. Morguu then opens fire with an oversized blaster, but proves to be a poor shot, only injuring one of the Indians when a near-miss strikes the ground at the Indian's feet. The dusty

-3-

cowpoke, having observed the arrival of Morguu's saucer at the beginning of the Comic, helps the

Indians escape from Morguu by lassoing the alien. The Indians then return to their village, while the

cowboy, enlisting the aid of some prospectors, prepares to use dynamite to bring the cliff down on

top of the flying saucer. The Comic ends there, with a promised "showdown" to occur in the next

issue, but apparently there were no further issues. Busti belatedly registered his copyright in "Bizarre

Fantasy #1," effective September 29, 2011.

## Discussion

### I.      Legal Standard—Summary Judgment

Summary judgment shall be rendered when the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine dispute as to any material fact and

that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex

Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir.

2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury

could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all

inferences drawn from the factual record in the light most favorable to the nonmoving party.

*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508.

Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a

motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150

(2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the

nonmoving party's case, the party opposing the motion must come forward with competent summary

judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II.    Elements of Copyright Infringement

"To establish a claim for copyright infringement, a plaintiff must prove that: (1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original." *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). Actionable copying under the second element requires a showing of (1) factual copying, and (2) substantial similarity between the copyrighted work and the allegedly infringing work. *Id.*

### A.      Factual Copying

Factual copying can be proven by either direct or circumstantial evidence.  *Id.*  From

circumstantial evidence, factual copying may be inferred under a two-part analysis, requiring

evidence of (1) prior access to the copyrighted work by the defendant, and (2) probative similarity.[3]

*Id.*  However, if the two works are "'so *strikingly* similar'" as to preclude the possibility of

independent creation, copying may be proven without evidence of prior access.  *Peel & Co. v. The*

*Rug Mkt.*, 238 F.3d 391, 394–95 (5th Cir. 2001) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d

111, 113 (5th Cir. 2001)).

### 1.      Prior Access

"To determine access, the court considers whether the person who created the allegedly

infringing work had a reasonable opportunity to view the copyrighted work."  *Id.* at 394  "A bare

possibility will not suffice; neither will a finding of access based on speculation or conjecture."  *Id.*

at 394–95.

Busti points to a page from Issue 388 of Comic Shop News, a trade publication with a weekly

circulation of 30,000.  Defs.' Mot. Summ. J. [#51-3], Ex. B, at 1.   Comic Shop News is sold to

comic retailers in bundles, and the retailers in turn give it away to customers as a promotional tool.

*Id.*  The page in question featured a short, two-paragraph story announcing the imminent launch of

---

[3]Probative similarity under factual-copying analysis is distinct from substantial similarity utilized in the second element of copyright infringement. *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 & n.4 (5th Cir. 1994) (adopting distinction proposed by Professor Alan Latman); *see generally* Alan Latman, *"Probative Similarity" as Proof of Copying: Toward Dispelling Some Myths in Copyright Infringement*, 90 COLUM. L. REV. 1187 (1990).  "[T]he purpose of the probative similarity inquiry is to determine whether factual copying may be inferred and . . . this inquiry is not the same as the question of substantial similarity, which dictates whether the factual copying, once established, is legally actionable." *Cash Money Records*, 394 F.3d at 370.

the Bizarre Fantasy comic.  The story includes a picture of the cover of Bizarre Fantasy issue one, which depicts a cowboy and an Indian battling the monstrous Morguu.  The story includes the following reference to the Comic: "The first issue of the ongoing series, scheduled for February release, is a Western-[sci-fi] tale that features cowboys and aliens as Morguu, Conqueror of Worlds, comes to the Old West to launch his invasion."  Pl.'s Resp. [#64-2], Ex. B, at 2.  However, the story does not state the Comic is entitled "Cowboys and Aliens."

Busti argues Rosenberg must have seen the Comic Shop News story, because the same page also features a five-paragraph piece regarding the acquisition of Malibu Comics (which was founded by Rosenberg) by Marvel Entertainment.  The new item includes the following regarding Rosenberg: "*Scott Rosenberg,* Malibu founder, is now a Senior Executive Vice President at Marvel; he will remain in charge of Malibu's operations and will report directly to Terry Stewart."  *Id.*  Busti invites the assumption Rosenberg would have read a news item about the merger in Comic Shop News. However, there is no evidence showing Rosenberg in fact saw the issue of Comic Shop news. Moreover, the text of the piece describing Busti's work merely describes a general idea: "cowboys and aliens."  Other than the cover, the content of the Comic is not depicted in Comic Shop News. And, the cover of the Comic depicts the alien leader one-handedly seizing the protagonist cowboy around the waist, while the cowboy attempts to lasso the alien.  No such scene appears in either the Graphic Novel or the Movie.  Thus, even if there was evidence Rosenberg saw the issue of Comic Shop News, it alone is not evidence of access to Busti's copyrighted work.  Busti effectively invites the Court to pile conjecture upon speculation in order to find access: specifically, the Court must

presume (1) Rosenberg read the Comic Shop News piece about the Malibu–Marvel acquisition,[4] (2) Rosenberg read the story about Bizarre Fantasy, simply because it was on the same page, and (3) as a result, Rosenberg subsequently tracked down a copy of Bizarre Fantasy #1 when it was published some five months later.  This is a supposition too far, and is thus no evidence.

A second argument Busti raises regarding access is to suggest he might have given Rosenberg a free, promotional copy of the Comic at an unspecified comic book convention between 1993 and 1996.  However, Busti has no specific recollection of meeting Rosenberg or giving him a copy of the Comic.  Rather, his argument on this point is premised on (1) having attended a number of conventions during this time, (2) it being his "practice to widely distribute copies of [the Comic] to fellow attendees as well as people who had purchased booths or displays," (3) "[s]ome of the larger conventions that I attended are ComicFest '94 from October 7-9, 1994 in Philadelphia, the Philadelphia Comic Book Spectacular from October 21-23, 1994, and the Heroes Convention in June, 1995 in Charlotte, North Carolina," and (4) "[i]f . . . Rosenberg was in attendance at any of these same comic book conventions, it is most likely that I provided a complimentary copy of [the Comic] to him."  Busti Affidavit [#64-1] ¶¶ 7–10.  This is no more than rank speculation—there is no evidence Busti and Rosenberg were ever at the same comic convention at the same time.  *See Peel & Co.*, 238 F.3d at 396–97.  What is more, there is no evidence Rosenberg ever attended the conventions listed above, or, for that matter, any conventions in Philadelphia or North Carolina.  Indeed, Busti's evidence on this point—Rosenberg's interrogatory answer—establishes Rosenberg attended conventions in New York, Illinois, and California, not Philadelphia or North Carolina:

---

[4] As noted earlier, Comic Shop News is a promotional item, directed at consumers of comic books.  There is no evidence Rosenberg, a comic-industry executive, was in the habit of reading Comic Shop News.

> I recall attending every San Diego Comic Con during the relevant time period, a few Chicago Comic Cons, approximately three New York Comic Cons, as many as six other comic book conventions in New York, and a number of Los Angeles based comic book conventions. I stopped travelling [sic] extensively to conventions after the births of my children in 1994-95 and thereafter attended mostly local conventions.[5] In the twenty year time period, I undoubtedly attended a few other comic conventions.[6]

Rosenberg Interrogatory Answer [#64-3] at 7. Again, Busti has no evidence, only a chain of conjectures. *See Armour v. Knowles*, 512 F.3d 147, 155 (5th Cir. 2007) (finding a string of "leaps of logic, none of which is substantiated by evidence in the summary judgment record" was no more than "'speculation and conjecture,'" and so failed meet the plaintiff's summary judgment burden).

Finally, Busti suggests a finding of access can be premised on distribution of his Comic. The Ninth Circuit has recognized wide dissemination of the plaintiff's work can stand alone as evidence of reasonable access. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000). Although the Fifth Circuit does not appear to have explicitly adopted this rule, it is consistent with the logic of the Fifth Circuit's decision in *Peel & Co.*, 238 F.3d at 397, and with distinguished copyright authorities, 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.02[A], at 13-26–13-27 (2011). By analogy, in the music industry, wide dissemination exists when the "'work was widely disseminated through sales of sheet music, records, and radio performances.'" *Three Boys*, 212 F.3d at 482 (quoting 2 PAUL GOLDSTEIN, COPYRIGHT: PRINCIPLES, LAW, AND PRACTICE § 8.3.1.1., at 90–91 (1989)). Here, Busti's only evidence of wide dissemination, aside from handing the Comic out at conventions, is from his affidavit: the Comic

---

[5] Rosenberg resides in California, and there is no suggestion Philadelphia or North Carolina conventions would have been "local" to him.

[6] The interrogatory was facially overbroad, and inquired about Rosenberg's convention attendance from "1993 to Present."

"was published and internationally distributed," and "I received fan mail from as far away as England and Brazil." Pl.'s Resp. [#64-1], Ex. A (Bust Aff.), ¶¶ 4–5. The latter statement is no evidence the Comic was widely disseminated, as there is no indication the fan mail was regarding the Comic. And the former is simply conclusory, being devoid of any details: how many copies were distributed, and where. There is no evidence of the type of pervasive display and distribution of the Comic needed to support a finding of wide dissemination. *See* 4 NIMMER, § 13.02[A], at 13-26–13-28 (suggesting a "saturation radio campaign" or distribution of 17,000 copies of a videotape constitute wide dissimination).[7]

## 2.    Probative or Striking Similarity

"[T]wo works are probatively similar if [there are] similarities between the two works (whether substantial or not) that, in the normal course of events, would not be expected to arise independently in the two works and that therefore might suggest that the defendant copied part of the plaintiff's work." *Positive Black Talk*, 394 F.3d at 370. In determining if probative similarity is present, both works should be examined as a whole (including both copyrightable and non-copyrightable parts). *Id.* at 369. However, it is enough if constituent parts of each work are similar; the plaintiff is not required to show the whole of the infringing work is similar to the whole of the copyrighted work. *Id.* at 369–70. In explaining the latter point, the Fifth Circuit used the example of an author copying an entire chapter from another's (otherwise different) work: a finding of probative similarity would be proper, even if the remaining twenty chapters were not similar. *Id.*

---

[7]However, even distribution of 17,000 copies of a work may be insufficient: the Ninth Circuit held this did not constitute widespread dissemination. *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003) ("*The Mystery Magician* only sold approximately 17,000 copies between 1986 and 1999; therefore, the video cannot be considered widely disseminated."). NIMMER ON COPYRIGHT suggests the Ninth Circuit erred in *Rice*. 4 NIMMER, § 13.02[A], at 13-27–13-28. However, the Court need not decide which persuasive authority to follow, as Busti has presented no evidence of how many copies of the Comic were distributed.

at 370 n.9.  As noted above, if the two works are *strikingly* similar, then the plaintiff need not prove access in order to prove factual copying.  *Peel & Co.*, 238 F.3d at 394–95.  Striking similarity is similarity of such a strong degree that it "preclude[s] the possibility of independent creation." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 56 (2d Cir. 2003).

The Graphic Novel is not strikingly similar to the Comic.  Although, as noted below, while some elements are similar, the work as a whole is in fact strikingly different, rather than similar.  The visual aspect of the two is very different: the Comic has a simple, "retro," pen-and-ink style, whereas the Graphic Novel is in vivid, full color throughout.  The tone of the two works is similarly different, with the Comic having a somewhat over-the-top, campy, classic comic book feel, whereas the Graphic Novel, with the exception of a few scattered comedic moments, tries very hard to be modern and serious in tone.  In particular, the prologue to the Graphic Novel is obviously intended to provide a thought-provoking (if rather unsubtle) comparison between Europeans settling the New World, and aliens invading Earth.  This theme is carried forward in the body of the Graphic Novel, including a scene in which a U.S. cavalry officer dismisses Native Americans as "filthy savages," only to be killed along with his men a few panels later by the alien leader, who pronounces the fallen soldiers to be "filthy savages."

Nor is the content strikingly similar.  When extracted from their context, placed side-by-side, and framed with well-chosen comparative language, as Busti's counsel has skillfully done, there are individual elements in the Comic and Graphic Novel which are similar.  But this similarity is not readily apparent when simply reading the two works as they were written, and so the content of the two works is not strikingly similar; that is, the similarity does not preclude independent creation. *Jorgensen*, 351 F.3d at 56.

Accordingly, the Court finds Busti has failed to raise a fact issue as to factual copying, because there is no evidence of access, and no showing of striking similarity. *See Peel & Co.*, 238 F.3d at 394–95. Therefore, Defendants are entitled to judgment as a matter of law. Alternatively, the Court will address the remainder of the copyright analysis.

Although the Comic and Graphic Novel are not strikingly similar, the Court finds there is sufficient probative similarity (when non-copyrightable elements are considered) to sustain a showing of factual copying, had Busti proven access. These are: (1) the spaceship flies overhead (2) immediately thereafter, Indians are the first to approach the spaceship, from a place of at least partial concealment; (3) in both works, the Indians consider, and reject, the idea the spaceship might be the work of white men,[8] (4) Morguu in the Comic, and Rado Dar, the alien leader in the Graphic Novel, have a somewhat similar aspect: both are large, muscle-bound creatures, with horns or horn-like protuberances on their heads and craggy faces; (5) Morguu and Rado Dar are both first seen as they descend from a ramp, lowered from their respective flying saucers; and (6) the Indians are attacked with some sort of ranged weapon immediately thereafter.[9] Taken together, there is thus evidence of

---

[8]In the Comic, the following dialogue occurs between Temquaw and Wotuck, the two Indians who discover the flying saucer, as the saucer door opens and Morguu emerges. "<Be on your *guard*, Temquaw!  Perhaps it is a *trap* set by the white man!>  <I do not think it is one of the white man's *tricks*, Wotuck!  *See* – it resembles neither *man* nor *animal!*>" Comic at 10. Similarly, the Indians in the Graphic Novel, upon finding the crashed spaceship, state: "<What is it?>  <One of the white men's machines?>  <This is beyond the whites.>" Graphic Novel at 11.

[9]However, the manner and sequence of the attack is rather different: Morguu gives the Indians a chance to surrender and become his slaves, which they reject by throwing a spear at him. Comic at 11–12. By contrast, the Indians in the Graphic Novel approach Rado Dar and the other aliens with a hand raised in greeting, and attempt to converse with the aliens.  In response, the three Indians are suddenly gunned down by three bursts of green energy, apparently from several sources (it is unclear whether Dar himself is shooting, or if all the shots come from his underlings, or even from the spaceship).  Graphic Novel at 14.  By contrast, Morguu himself is clearly the one shooting in the Comic, and he succeeds only in striking one of the Indians indirectly, by blasting the ground at the Indian's feet.  Comic at 12.  The Indians then escape, when the Cowboy suddenly lassoes Morguu's weapon.

probative similarity.[10] The Court finds one element Busti invokes is not probative: Busti notes both works place lesser-than and great-than signs, or "bracket arrows," around words spoken in Apache. However, this appears to be only attorney argument, and Busti himself does not claim to have invented this practice. To the contrary, Defendants note this is a wide-spread convention in comics and graphic novels. *See* Nate Piekos, *Comic Book Grammar & Tradition*, BLAMBOT (2013) http://www.blambot.com/grammar.shtml ("When a character speaks in a foreign language, each block of dialogue is begun with a 'less than' symbol and ended with a 'greater than' symbol. Often, the first appearance of the language will also end with an asterisk to denote an Editorial Caption that explains what language this is being translated from.").

## B.    Substantial Similarity

"If a plaintiff has established factual copying (and the defendant does not establish independent creation), the plaintiff must also prove that the copyrighted work and the allegedly infringing work are substantially similar." *Positive Black Talk*, 394 F.3d at 368. "'To determine whether an instance of copying is legally actionable, a side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'" *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 816 (5th Cir. 1997) (quoting *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1341 (5th Cir. 1994)).

---

[10]Some circuits employ an "inverse relationship" analysis, whereby the greater the evidence of access, the less evidence of probative similarity is required, or vice versa. *See, e.g., Jorgensen*, 351 F.3d at 56 (citing 4 NIMMER § 13.03[D], at 13–77). This is apparently a logical extension of the rule excusing the plaintiff from establishing access when the similarity is striking. *See Positive Black Talk*, 394 F.3d at 371–72. However, to date the Fifth Circuit has neither adopted nor disapproved of the inverse relationship metric. *Id.* Alternatively, under inverse relationship analysis, the Court finds the relatively weak showing of probative similarity is insufficient to raise a fact issue on factual copying, given the complete absence of evidence of access. In further alternative, even if Busti were correct in characterizing the Comic Shop News page and convention visits as evidence of access, this evidence is so weak as to require a far greater showing of probative similarity than is present here.

"Although this question typically should be left to the factfinder, summary judgment may be appropriate if the court can conclude, after viewing the evidence and drawing inferences in a manner most favorable to the nonmoving party, that no reasonable juror could find substantial similarity of ideas and expression." *Peel & Co.*, 238 F.3d at 395 (footnote omitted).  Alternatively, judgment as a matter of law is also proper if "the similarity between two works concerns only non-copyrightable elements of the plaintiff's work." *Herzog v. Castle Rock Entm't*, 193 F.3d 1241. 1247 (11th Cir. 1999) (cited approvingly in *Peel & Co.*, 238 F.3d at 395 n.17).

Ideas are not protectable in copyright; only particular expressions of ideas may be protected. *See* 17 U.S.C. § 102(b); *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442–43 (9th Cir. 1994).  "Moreover, where all that has been copied is plaintiffs' idea, there is no copyright infringement." *Taylor v. IBM*, 54 F. App'x 794, 2002 WL 31845220, at *1 (5th Cir. 2002).  "Other materials not subject to copyright include facts, information in the public domain, and *scenes a faire*, i.e., expressions that are standard, stock or common to a particular subject matter or are dictated by external factors." *Eng'g Dynamics, Inc.*, 26 F.3d at 1344.

The Court finds the two works are not substantially similar.  Many of the aforementioned similarities, while probative, are unprotectable ideas or *scenes a faire*, and so cannot support a showing of substantial similarity. *See id.*  The most prominent similar element is the depiction of the aliens first appearing on a descending ramp from their respective flying saucers.  It is hard to conceive of a more common, stock scene for works involving aliens, and as such it is unprotectable. Similarly, although both works have the flying saucer fly overhead, this is likewise a stock scene. Morever, it is executed quite differently.  In the Comic, the cowboy is on his horse, and sees the flying saucer zoom overhead, executing an abrupt turn, all in a single frame.  In the Graphic Novel,

-14-

Zeke is on the ground, having been unhorsed by the Indians, when the loud "KRAKABOOM!"
interrupts. The flying saucer only appears in a later frame, without Zeke. The alien leaders, while
similar in size and general build, are very different in their details: Morguu is a golem-like figure,
with crude, lumpen features, and no clothing other than a speedo-type covering. Rado Dar has
distinctly-rendered horns and sharply defined features, and is wearing a suit of armor. Although the
Indians in both works first approach the flying saucer from a place of concealment, it is a trope as
old as the Western to depict Indians as being skilled at concealment. Likewise, cowboys—and
sometimes, cowgirls—have always used lassos to theatrical effect.

In addition, as noted previously, when viewing each work as a whole, the two simply are not
similar. *See Creations Unlimited*, 112 F.3d at 816. The Court accordingly finds no reasonable jury
could find actionable copying, and alternatively grants summary judgment due to lack of substantial
similarity. *See Peel & Co.*, 238 F.3d at 395.

### C.    Independent Creation

In final alternative, Defendants are entitled to summary judgment because of the
overwhelming, conclusive evidence of independent creation. If the plaintiff adduces evidence of
factual copying, the defendant may nevertheless rebut the showing by proving he independently
created the allegedly infringing work. *Positive Black Talk*, 394 F.3d at 368. Here, Defendants have
produced two classes of evidence which establish independent creation.

The first is an array of prior publications which incorporated cowboys and aliens together,
and which Rosenberg affirms having reviewed while developing the "one-sheet" and pitch packet
that led up to the Graphic Novel. These include four prior comic books—Space Western, Tex,

Martin Mystere, and Zagor.[11]  Defs.' Mot. Summ. J. [#51-29], Exs. U, X, Y, and Z.  Also presented are two movies—Oblivion and its sequel, Backlash: Oblivion 2.[12]   The box cover for Oblivion—which was released in 1994—includes the phrase, "In the year 3031...it's Cowboys and Aliens."  *Id.*, Ex. Q, at 3.

The second set of evidence is an extensive set of development notes and sketches, showing how Rosenberg and others collaborated in creating various aspects and distinctive details of the Graphic Novel.  These exhibits reveal something of the creative design process, in which (1) different versions of the aliens are produced and discarded, (2) other visual elements are proposed, some to be refined further and incorporated into the Graphic Novel, others to be discarded, and (3) an array of characters are developed and modified, before ultimately taking on their final forms as seen in the Graphic Novel.

Collectively, these two sets of evidence, in conjunction with Rosenberg's affidavit, establish he first conceived of his own cowboys and aliens concept in 1975, having seen the general idea in several other publications, and then worked with Ervin Rustemagic over several years to develop the concept.  He also commissioned an artist named Bane Kerac to produce cowboys and aliens concept art in 1988, well before Busti's Comic was published.  Def.'s Mot. Summ. J. [#51-18], Ex. F, at 1. The Court accordingly finds no reasonable juror could fail to find Defendants independently created the Graphic Novel.

---

[11]Defendants also point to a comic called Twin Earths, but while this comic apparently combined the nineteenth century and space travel, there is no indication in the record it contained cowboys or aliens.  *See* Defs.' Mot. Summ. J. [#51-37], Ex. V, at 2–3.

[12]Despite costarring George Takei, these movies were apparently not great commercial successes.

**Conclusion**

Accordingly,

IT IS ORDERED that Defendants Platinum Studios, Inc., Scott Mitchell Rosenberg, Universal Studios, Inc., and Dreamworks II Distribution Co, LLC's Motion for Summary Judgment [#51] is GRANTED.

SIGNED this the **29**ᵗʰ day of August 2013.


SAM SPARKS
UNITED STATES DISTRICT JUDGE